UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHELLE McCARTY, | CASE NO. 4:24-CV-00451-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

INTRODUCTION

Plaintiff Michelle McCarty challenges the Commissioner of Social Security's decision denying disabled widow's benefits (DWB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On March 8, 2024, under Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Mar. 8, 2024). All parties later consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure (ECF #8); thus, on March 19, 2024, thes matter was re-assigned to me for disposition. (Non-document entry dated Mar. 19, 2024).

Following review, and for the reasons below, I **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Ms. McCarty applied for DWB and SSI on July 28, 2021, alleging a disability beginning March 1, 2018. (Tr. 75, 84). The claims were denied initially and on reconsideration. (Tr. 113,

118, 139, 144). Ms. McCarty then requested a hearing before an ALJ. (Tr. 166). Ms. McCarty

(represented by counsel) and a vocational expert (VE) testified before the ALJ on February 14,

2023. (Tr. 40-72). On March 21, 2023, the ALJ determined Ms. McCarty was not disabled.

(Tr. 15-32). On January 19, 2024, the Appeals Council denied Ms. McCarty's request for review,

making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R.

§§ 404.984(b)(2) and 416.1484(b)(2)). Ms. McCarty (represented by new counsel) then timely filed

this action on March 8, 2024. (ECF #1).

FACTUAL BACKGROUND

## I.     Personal and vocational evidence

Ms. McCarty was 49 years old on the disability-onset date and 54 years old at the hearing.

(*See* Tr. 75; ECF #10 at PageID 1111). She has a ninth-grade education and prior work experience

as a cashier and an assistant manager. (Tr. 268).

## II.     Relevant medical evidence

Ms. McCarty claims disability for her mental health impairments, restless leg syndrome,

and neuropathy. (*See* Tr. 267).

On May 21, 2020, Ms. McCarty established care with Daniel Fitzpatrick, D.O. (Tr. 597).

She complained of depression and anxiety stemming from the loss of family members and her

husband's terminal cancer diagnosis. (*Id.*). She was diagnosed with type 2 diabetes mellitus, restless

leg syndrome, hyperlipidemia, depression, and anxiety. (Tr. 600-01). For her diabetes, she was

prescribed medication, as well as diet and exercise. (Tr. 600). For her restless leg syndrome,

hyperlipidemia, depression, and anxiety, Dr. Fitzpatrick also prescribed medication. (Tr. 601). On

November 19, 2021, Ms. McCarty returned to refill her prescriptions for her diabetes and

2

neuropathy. (Tr. 588). She also complained of coughing and wheezing and was prescribed an inhaler for bronchitis. (Tr. 588-89).

On August 21, 2020, Ms. McCarty presented for a three-month follow-up appointment with Dr. Fitzpatrick. (Tr. 590). She complained of pain in both lower extremities starting right below the knee and in the back of the knee that radiated down. (*Id.*). She also reported numbness in her feet. (*Id.*). She returned in February and April 2021 for prescription refills. (Tr. 586-87, 584-83).

On May 17, 2021, Ms. McCarty returned to Dr. Fitzpatrick for a follow-up evaluation and refill of her medications. (Tr. 581). Ms. McCarty complained of nerve pain in her legs. (Tr. 582). In the associated progress note, Dr. Fitzpatrick commented Ms. McCarty has diabetic polyneuropathy for the first time by name, although the condition is alluded to elsewhere. (Tr. 581; *see also* Tr. 576, 567). She returned on June 9, 2021, complaining of similar pain, including lower-back and groin pain and was prescribed pain relievers. (Tr. 578).

On May 18, 2021, Ms. McCarty presented to Coleman Behavioral Health for a mental-health diagnostic evaluation. (Tr. 470). She was diagnosed with bipolar disorder and generalized anxiety disorder arising from grieving her husband's death a month earlier. (Tr. 481). The diagnosis also reported cannabis and tobacco use disorders, unspecified obesity, and neuropathy. (Tr. 482). The medical records note she "struggles with severe depression" that "causes her to become depressed, angry, and anxious" and her other medical issues cause her "to move slowly and exacerbate her moods." (Tr. 482). She was referred for counseling and to a psychiatrist. (Tr. 483).

On June 2, 2021, Ms. McCarty presented to Coleman Behavioral Health for a follow-up telehealth appointment. (Tr. 505). She reported feeling depressed, rating it 10 out of 10, but she

3

was "not crying all the time." (*Id.*). She reported continuing to feel chronic anxiety, rating it a 9 out of 10, and that she experiences panic attacks and nightmares. (*Id.*). She is prescribed varying medications for her bipolar disorder, anxiety, and depression. (Tr. 505-06). She reported memory issues, including "mildly disjointed" concentration, difficulty keeping focused, and processing issues. (Tr. 508). Her thought process was assessed "logical," her speech and language "normal," and her thought content "unremarkable." (*Id.*). She was continued on her medications and with therapy. (Tr. 511).

On June 30, 2021, Ms. McCarty returned for a follow-up telehealth visit with Coleman Behavioral Health, where she reported her medications were working, though she still felt depressed and anxious and was experiencing panic attacks and nightmares. (Tr. 496). She rated her depression as a 6 out of 10 and her anxiety as an 8 or 9 out of 10. (*Id.*). She reported memory issues, including "mildly disjointed" concentration. (Tr. 500). Her thought process was assessed "logical," her speech and language "normal," and her thought content "unremarkable." (Tr. 499). Her medications were changed and she was continued on therapy. (Tr. 502).

On August 4, 2021, Ms. McCarty presented to Coleman Behavioral Health for a follow-up visit. (Tr. 487). She reported still feeling depressed and anxious and that she continued experiencing panic attacks and nightmares. (*Id.*). She rated her depression as a 7 out of 10 and her anxiety as an 8 or 9 out of 10. (*Id.*). She reported having fewer crying spells, down to one every other day. (*Id.*). She reported memory issues, including "mildly disjointed" concentration. (Tr. 491). Her thought process was assessed "logical," her speech and language "normal," and her thought content "unremarkable." (Tr. 490). She was continued on her medications and therapy. (Tr. 493).

On April 12, 2022, Ms. McCarty presented at the emergency department for hyperglycemia and an abscess that gradually onset over the past few days. (Tr. 611). She arrived with a high heart rate but was otherwise stable and not in acute distress. (Tr. 622). She was placed on insulin. (*Id.*). She was admitted for surgery on April 12 to treat the abscess. (Tr. 626). After surgery, she was admitted to the intensive care unit from April 12 to 14 for her diabetes. (Tr. 649-50; *see also* Tr. 658). She admitted to "rather poor compliance" with her medications since her husband died the year before. (Tr. 649). Ms. McCarty was discharged home on April 17 with instructions to follow up a week later. Ms. McCarty followed up on May 2, 2022, with Dr. Fitzpatrick. (Tr. 1003).

## III.    Medical opinions

On September 24, 2021, state agency psychological consultant Robyn Murry-Hoffman, Psy.D., reviewed Ms. McCarty's record as part of the initial determination of her disability applications. (Tr. 77-78, 86-87). Dr. Murry-Hoffman assessed Ms. McCarty faced a moderate limitation in her ability to understand, remember, or apply information; concentrate, persist, or maintain pace; and adapt or manage herself. (Tr. 77, 86). Dr. Murry-Hoffman assessed a mild limitation in Ms. McCarty's ability to interact with others. (*Id.*). On March 17, 2022, state agency psychological consultant Paul Tangeman, Ph.D., affirmed Dr. Murry-Hoffman's findings on reconsideration. (Tr. 97-98, 106-07).

On October 7, 2021, state agency medical consultant Gary Hinzman, M.D., reviewed Ms. McCarty's record as part of the initial determination of her disability applications. (Tr. 78-79, 87-89). Dr. Hinzman assessed that Ms. McCarty can lift and carry 20 pounds occasionally and 10 pounds frequently and she can stand and walk for about six hours of an eight-hour workday. (Tr. 78, 87). Dr. Hinzman also assessed Ms. McCarty can (i) frequently climb ramps and stairs; (ii) never climb ladders, ropes, and scaffolds; (iii) frequently stoop, kneel, and crouch;

5

(iv) occasionally crawl; and (v) must avoid all exposure to hazards such as unshielded heavy machinery and unprotected heights. (Tr. 78-79, 88). On March 23, 2022, state agency medical consultant Mehr Siddiqui, M.D., adopted Dr. Hinzman's opinions for both periods on reconsideration review. (Tr. 99-100, 108-09).

## IV.    Relevant testimonial evidence

Ms. McCarty testified she lived with her daughter and two teenaged granddaughters. (Tr. 47). She completed eighth grade but left to raise her children. (Tr. 48). She states she cannot work because she cannot sit or stand for more than 15 to 20 minutes before changing stance. (Tr. 53). She uses a cane when in public and a walker for longer distances. (Tr. 54).

Ms. McCarty suffers from pain in her feet and lower back due to neuropathy. (Tr. 55). Her doctors have prescribed medications that she said help "a little bit." (Tr. 55-56). She is also prescribed sleep medications because neuropathy and restless leg syndrome prevent her from sleeping. (Tr. 55). She uses cannabis to reduce pain and help her sleep. (Tr. 61). She estimates sleeping about four to five hours in any one night. (Tr. 56).

Ms. McCarty has diabetes and takes insulin regularly. (Tr. 57). Since having diabetes, she has dizzy spells and has fallen about eight times in the previous six months but has not needed to visit the hospital from those falls. (Tr. 57-58). She did not attribute her neuropathy to her diabetes when asked by the ALJ. (Tr. 57). Ms. McCarty's hands tingle and go numb, though she does not know whether it is caused by her neuropathy or a carpal-tunnel surgery from years earlier. (Tr. 63-64). She reports dropping things all the time. (Tr. 63). Her carpal tunnel is in her dominant right hand, and she wears braces when her hands hurt. (Tr. 64).

Ms. McCarty is diagnosed with depression, bipolar disorder, and anxiety. (Tr. 58, 60). She receives counseling once or twice a month and sees a psychiatrist. (Tr. 59). She reports feeling a

high depression and that she gets upset easily, making her want to explode or cry. (Tr. 58-59). She is also easily frustrated. (Tr. 60). She was hospitalized once for mental health over ten years ago. (Tr. 59). Her anxiety causes daily panic attacks lasting about ten minutes. (Tr. 60). There is no common trigger for her panic attacks or becoming upset. (*Id.*). She also experiences nightmares of the night her husband fell and died in their bathroom. (Tr. 61). She uses cannabis to aid her anxiety and get to sleep at night. (*Id.*).

Ms. McCarty last worked part-time as a cashier at a convenience store and described a typical workday as including mopping floors and stocking. (Tr. 49). Previously, she had been an assistant manager as well as a cashier and her job involved daily accounting, payroll, ordering, and supervising staff (but she did not hire or fire). (Tr. 50-51). She estimated the heaviest things she had to lift or carry were 30-packs of beer or 20-pound pots. (Tr. 49, 51-52).

Ms. McCarty starts a typical day watching TV in her bedroom after taking her medications. (Tr. 62). Her bedroom is on the second floor and going downstairs is a long and painful process. (Tr. 47-48). Ms. McCarty does the dishes, but her family does the laundry since she fell on the steps to the basement. (Tr. 47, 48, 62). She goes shopping with her daughter or her granddaughters because her anxiety prevents her from shopping alone. (Tr. 47). She regularly visits a friend on the weekends, but otherwise does not leave the house. (Tr. 62). The farthest she can walk is across the street to the park, but she was exhausted and could not walk back without help. (Tr. 53-54).

The VE classified Ms. McCarty's prior work as Cashier II and Management Trainee. (Tr. 67). The ALJ posed to the VE a hypothetical individual with Ms. McCarty's age and education who: (i) can work at the light exertional level; (ii) can never climb ladders, ropes, or scaffolds;

(iii) can occasionally climb ramps or stairs; (iv) can occasionally, stoop, kneel, crouch, and crawl; (v) can frequently balance; (vi) must avoid all exposure to extreme cold, vibrations, and workplace hazards, such as unprotected heights and dangerous moving machinery, and driving; (viii) can perform simple, routine, and repetitive tasks, but not at a high production rate; and (ix) has a workplace with only occasional changes with a routine work setting. (Tr. 67-68). The VE testified such an individual could work as a cashier, but not at the level Ms. McCarty actually performed her job. (Tr. 68). The VE opined such an individual could perform other unskilled jobs, such as mail clerk, marker, or routing clerk. (Tr. 68).

The ALJ then posed if the hypothetical individual was limited to frequent or occasional bilateral handling and fingering. (Tr. 68-69). The VE responded that a limitation to frequent would have no effect, but a limitation to occasional would exclude the individual from the cited jobs. (*Id.*). But in that case, the VE testified the hypothetical individual could work as an usher and a counter clerk. (Tr. 69).

The ALJ then further limited the individual to occasional interaction with the general public. (Tr. 69). The VE concluded the cashier, usher, and counter clerk jobs would be eliminated, but the individual could work as a mail clerk, marker, or routing clerk. (Tr. 69). The ALJ then further limited the individual to the sedentary exertion level and the VE opined the individual could not perform any of the cited jobs. (Tr. 70).

STANDARD FOR DISABILITY

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. McCarty is the unmarried widow of a deceased insured worker over the age of 50 and met the non-disability requirements for DWB. (Tr. 20). The ALJ further determined Ms. McCarty had not engaged in substantial gainful activity since March

1, 2018. (*Id.*). At Step Two, the ALJ identified the following severe impairments: obesity, lumbar degenerative disc disease and stenosis with neurogenic claudication and sciatica, type 2 diabetes mellitus with diabetic polyneuropathy and hyperglycemia and ketoacidosis without coma, bipolar disorder and depression, anxiety disorder, posttraumatic stress disorder, and cannabis use disorder. (Tr. 21). At Step Three, the ALJ found Ms. McCarty's impairments did not meet the requirements of, or were medically equivalent to, a listed impairment. (Tr. 22-25).

At Step Four, the ALJ determined Ms. McCarty's RFC as follows:

> After careful consideration of the entire record, I find that [Ms. McCarty] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs. [Ms. McCarty] can occasionally stoop, kneel, crouch and crawl, and frequently balance. She should avoid concentrated exposure to extreme cold and vibrations, and all exposure to hazards such as unprotected heights, dangerous moving mechanical parts, and the operation of motor vehicles. [Ms. McCarty] can perform simple, routine and repetitive tasks, but cannot perform tasks which require high production rate pace (such as assembly line work), and can respond appropriately to occasional change in a routine work setting.

(Tr. 25). The ALJ then found Ms. McCarty could perform her past relevant work as a cashier and as a management trainee. (Tr. 29). The ALJ made an alternative finding at Step Five, finding that other jobs exist in significant numbers in the national economy that Ms. McCarty can perform, including mail clerk, marker, and routing clerk. (Tr. 30-31). Therefore, the ALJ found Ms. McCarty was not disabled. (Tr. 48).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by

substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and

thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.")

### Discussion

Ms. McCarty raises two issues for review, arguing the ALJ erred at Steps Four and Five of the sequential analysis:

1. In evaluating the prior administrative medical findings of Dr. Murry-Hoffman and Dr. Tangeman, the ALJ failed to comply with 20 C.F.R. §§404.1520c(b)(2), 416.920c(b)(2) and SSR 96-8p; and

2. In evaluating the availability of work at Steps Four and Five of the sequential evaluation process for determining disability, the ALJ erred in his evaluation of the Vocational Expert testimony.

(*See* ECF #10 at PageID 1110). The Commissioner responds that substantial evidence supports the ALJ's findings at Step Four and that Ms. McCarty waived her challenges to the ALJ's findings at Step Five. (ECF #11 at PageID 1132, 1137). I discuss each in turn.

### I.    RFC and the prior administrative medical findings

Ms. McCarty first argues the ALJ committed reversible error by not discussing the supportability and consistency of the prior administrative medical findings of Dr. Murry-Hoffman and Dr. Tangeman in violation of 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2). Second, Ms. McCarty argues the ALJ's RFC conflicted with the findings of Dr. Murry-Hoffman and Dr.

Tangeman without explanation in violation of Social Security Ruling 96-8p. (ECF #10 at PageID 1116). Her second argument dovetails into her second issue for review.

### A.    The ALJ properly analyzed the persuasiveness of the prior administrative medical findings

Because Ms. McCarty filed her claims after March 27, 2017, the ALJ will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a); *see also Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 82 Fed. Reg. 5844 (Jan. 18, 2017). Rather, an ALJ must explain how persuasive the ALJ finds those opinions to be. *See id.* § 404.1520c(b).

The ALJ determines the persuasiveness of a medical source's opinion by assessing five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. *Id.* § 404.1520c(c). Supportability and consistency are the most important factors the ALJ must consider. *Id.* § 404.1520c(b)(2); *see also Palmore v. Comm'r of Soc. Sec.*, No. 1:20-CV-36, 2021 WL 1169099, at *4 (S.D. Ohio Mar. 29, 2021). As such, the ALJ must "*explain* how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. *See* 20 C.F.R. § 404.1520c(b)(2) (emphasis added).

The ALJ evaluated the prior administrative medical findings as follows:

> I find the opinions of the State agency medical consultants to be persuasive because, they are acceptable medical sources with knowledge of and experience with the social security benefits programs who[] had the opportunity to independently and thoroughly review the records before them, although they did not have the benefit of a treating relationship with [Ms. McCarty] or the records received at the hearing level. However, the evidence of record developed after they rendered their opinions

13

did not change materially or in a manner that would otherwise render their opinions inconsistent with the record generally. Specifically, X-ray findings of advanced degeneration at L4-L5 and L5-S1 and her limited bilateral lower extremity sensation on monofilament testing is consistent to the finding that [Ms. McCarty] is limited to light exertional work. Other examination findings showed vibratory sensation diminished on left medial malleolus and right latera malleolus, and monofilament sensation absent from bilateral ball of feet and bilateral heels along with minimal sensation to all toes and bilateral foot arches. [Ms. McCarty]'s gait is for the most part noted as normal, with no mention of an assistive device, whether observed or prescribed, although [Ms. McCarty] alleges use of the same. Therefore, limiting [Ms. McCarty] to a light exertional level with postural and mental restrictions is persuasive.

(Tr. 28-29) (citations omitted).

The ALJ's decision evinces application of multiple regulatory factors in analyzing the prior administrative medical findings. The ALJ applied the consistency factor in writing, "X-ray findings of advanced degeneration at L4-L5 and L5-S1 and her limited bilateral lower extremity sensation on monofilament testing *is consistent* to the finding that [Ms. McCarty] is limited to light exertional work." (Tr. 29) (emphasis added). This sentence analyzes the medical evidence in the record—X-ray imaging and monofilament testing—and concludes the evidence is consistent with the state agency consultants' conclusion that Ms. McCarty has an exertional limitation to light work. The ALJ also noted the inconsistency between Ms. McCarty's self-reported use of a cane and a walker and physical examinations that found a normal gait. The ALJ also noted the "relationship with the claimant" factor by noting the state agency consultants "did not have the benefit of a treating relationship with [Ms. McCarty]." (Tr. 28).

Although the ALJ's analysis does not expressly mention the supportability factor, the ALJ is not required to use specific phrasing referencing the regulations. *See Sovey v. Kijakazi*, No. 5:20-CV-00386-MAS, 2022 WL 447052, at *4 (E.D. Ky. Feb. 9, 2022) (collecting cases rejecting "magic words" arguments). Rather, the ALJ's decision must be read as a whole and with common sense.

14

*Id.* (quoting *Buckhanon ex rel. J.H. v. Astrue*, 368 F.App'x 674, 678-79 (7th Cir. 2010)). Reading the ALJ's analysis in that manner, the ALJ considered the supportability factor. "Supportability" refers to "the relevancy of objective medical evidence" and the "degree of explanation given by the medical source to support the limitations assessed in the opinion." *See* 20 C.F.R. § 404.1520c(c)(1). Here, although the ALJ's decision did not invoke the term "supportability," it cited objective medical evidence—X-ray imaging and examination findings—that supported the opined limitation to light work with postural restrictions. Thus, the ALJ implicitly found the prior administrative medical findings to be supported. *See Sovey*, 2022 WL 447052, at *4 (ALJ implicitly found a medical opinion not supported by noting the medical source's own examination and that the explanations were not phrased in functional terms).

In sum, the ALJ provided a rationale for why the state agency consultants' findings were persuasive by applying the consistency factor, the treating relationship factor, and the supportability factor implicitly. The ALJ supported each factor with substantial evidence. Thus, the ALJ's analysis comported with 20 C.F.R. § 404.1520c and substantial evidence supported the ALJ's conclusions.

### B.    The ALJ properly explained the mental RFC findings

Ms. McCarty next argues the ALJ failed to explain a conflict between the RFC and the prior administrative medical findings. She asserts those findings limited Ms. McCarty to simple, routine tasks of two-to-three steps but the ALJ's RFC limited her to simple, routine, and repetitive tasks. (ECF #10 at PageID 1116) (citing Tr. 25 and 80). She argues that "a limitation to simple, routine, and repetitive tasks can permit jobs ranging from a GED Reasoning Level of 3 to a GED Reasoning Level of 1" while "a limitation to tasks of two-to-three steps precludes a GED Reasoning

Level of 3 and may preclude a GED Reasoning Level of 2 depending on whether or not the ALJ discussed the issue." (*Id.*). She argues the ALJ failed to explain this difference.

The ALJ is charged with assessing a claimant's RFC "based on all of the relevant medical and other evidence" of record. 20 C.F.R. § 416.945(a)(3). Even where an ALJ provides "great weight" to a prior administrative medical finding, an ALJ need not adopt it wholesale or verbatim. *Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015).

The ALJ explained the mental limitations in the RFC, but did so three paragraphs prior to analyzing the persuasiveness of the prior administrative medical findings:

> Regarding the consistency of the claimant's mental health allegations, she has had a somewhat limited treatment history since the alleged onset date, without evidence of psychiatric hospitalization in the record. Such absence of documentation of ongoing treatment is inconsistent, and it seriously undermines allegations of disabling, or even severe, limitations of function, lasting twelve months in duration, and despite treatment. The majority of the claimant's treatment followed the death of her husband and throughout that period she did have issues with memory, concentration, and focus which was treated with psychotropic medications. The claimant did report an improvement of symptoms with treatment. During her hospitalization for ketoacidosis and abscess she presented as tearful as she is still mourning the loss of her husband. It appears the claimant did commence treatment again in late 2022. She reported daily cannabis use, crying, avoiding people and saying mean things. She was diagnosed with bipolar disorder, posttraumatic stress disorder, tobacco use disorder and obesity. Mental status examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including findings of the claimant being cooperative, having clear speech, fair to good insight and judgment, normal eye contact, to be full oriented, friendly and having logical thought processes. To accommodate the claimant's mental health impairments, the herein residual functional capacity limits the claimant to simple, routine and repetitive tasks, but not at a production rate pace, and can respond appropriately to occasional changes in a routine work setting.

(Tr. 28) (citations omitted). Again, there is no requirement that an ALJ's rationale must come in "tidy packaging"; courts must "read the ALJ's decision as a whole and with common sense." *See Sovey*, 2022 WL 447052, at *4 (quoting *Buckhanon ex rel. J.H.*, 368 F.App'x at 678-79). Reading the

ALJ's decision as a whole, the ALJ explained the mental RFC limitations based on the medical information in the record and supported those limitations with substantial evidence.

I therefore decline to order a remand on this basis.

## II. Step Five Determination

Second, Ms. McCarty argues the ALJ failed at Step Five to resolve apparent conflicts between the testimony of available jobs and the ordinary definitions of these jobs in the Dictionary of Occupational Titles (DOT) given temperaments and GED reasoning levels required of these jobs. (ECF #10 at PageID 1117). Ms. McCarty also argues that the usher and counter clerk jobs the VE cited are obsolete and insignificant.[1] (*Id.* at PageID 1123-25). The Commissioner responds that Ms. McCarty waived these arguments because she did not challenge the VE's testimony during the hearing. (ECF #12 at PageID 1137).

At Step Five, the ALJ must make a finding "supported by substantial evidence that [a claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation and citation omitted). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on the VE's testimony in response to a

---

[1]     The Commissioner recently issued Emergency Messages regarding reliance on certain occupations at Step Five. *See* Social Security Administration, *Isolated Occupations We Will Not Use to Support a "Not Disabled" Finding at Step Five of the Sequential Evaluation Process*, EM-24026, http://secure.ssa.gov/apps10/reference.nsf/links/0621202402 1759PM (June 22, 2024); *Guidance Regarding the Citation of Certain Occupations at Step Five of the Sequential Evaluation Process*, EM-24027, http://secure.ssa.gov/apps10/reference.nsf/links/06212024022159PM (June 22, 2024). Because the Emergency Messages do not identify usher or counter clerk, they provide no reason to disturb the ALJ's determination here.

hypothetical, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010).

During testimony, a VE commonly uses the DOT, a list of "maximum requirements of occupations as generally performed"; however, a VE "may be able to provide more specific information about jobs or occupations than the DOT." *See* Soc. Sec. Ruling 00-4P, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000). A VE can craft an answer in response to an individualized hypothetical RFC with potential limitations not contemplated by the DOT. *See Beinlich v. Comm'r of Soc. Sec.*, 345 F.App'x 163, 168 (6th Cir. 2009) ("[An] ALJ may choose to rely on the VE's testimony in complex cases, given the VE's ability to tailor her finding to an 'individual's particular [RFC].'"). "[N]either the DOT nor [the expert's testimony] automatically trumps when there is a conflict." SSR 00–4p, at *2.

SSR 00–4p requires an ALJ to elicit a reasonable explanation from a VE when there is an apparent conflict between the VE's testimony and the DOT:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

*Id.* at *2.

The ALJ has an affirmative responsibility to "inquire, on the record" as to any inconsistency between the VE's testimony and the DOT. *See id.* Beyond this first inquiry, the Sixth Circuit has held the ALJ need not further investigate the accuracy of a VE's testimony "especially when the claimant fails to bring any conflict to the attention of the" ALJ. *Ledford v. Astrue*, 311

F.App'x 746, 757 (6th Cir. 2008). That obligation falls to the claimant's counsel. *Beinlich*, 345

F.App'x at 168. "Absent an objection to the vocational expert's testimony, [an] ALJ reasonably

relie[s] on the testimony." *Staymate v. Comm'r of Soc. Sec.*, 681 F.App'x 462, 468 (6th Cir. 2017).

Here, Ms. McCarty was represented by counsel during the administrative hearing. (Tr. 38).

The ALJ, the VE, and Ms. McCarty's counsel had the following colloquy about whether any of the

VE's testimony was inconsistent or outside the DOT:

> ALJ: Thus far, is anything in your testimony been inconsistent with other otherwise you're relying upon information not expressly contained in the DOT?
>
> VE: The off task and the absenteeism is not discussed in the DOT and the interaction with the general public that is also not discussed in the DOT, all of those are based on my professional education, training, and experience.
>
> ALJ: Well, thank you, Ms. Fontaine, Attorney Mazanetz, additional questions for the vocational expert?
>
> CLAIMANT'S COUNSEL:   No, your honor.
>
> * * *
>
> ALJ: Well, thank you counsel. And Attorney Mazanetz, my understanding, at least from your perspective, [is that] the record is complete and ready for a decision?
>
> CLAIMANT'S COUNSEL:   That's correct, your honor.

(Tr. 70-71). The ALJ's decision reflects, "Pursuant to SSR 00-4p, I have determined that the

vocational expert's testimony is consistent with the information contained in the" DOT. (Tr. 31).

The Sixth Circuit and district courts within this judicial district have applied that rule

when the claimant does not object to or cross-examine a VE citing allegedly obsolete jobs. *See, e.g.,*

*O'Neal v. Comm'r of Soc. Sec.*, 799 F.App'x 313, 318 (6th Cir. 2020) (finding no error where the VE

cited allegedly obsolete jobs but the claimant's attorney did not question the VE); *see also Sylvester v.*

19

*Comm'r of Soc. Sec.*, No. 4:23-cv-00778, 2024 WL 1531323, at *5 (N.D. Ohio Feb. 26, 2023) (finding that the claimant waived a challenge to a vocational expert's testimony "by failing to raise it at the ALJ hearing level and cross-examine the VE"), *report and recommendation adopted*, 2024 WL 2186175 (N.D. Ohio May 15, 2024).

Thus, without any objection from Ms. McCarty's counsel or questioning about potential inconsistencies, the ALJ was not obligated to independently seek out conflicts that the VE did not find and could reasonably rely on the VE's unchallenged testimony. *See Adams v. Comm'r of Soc. Sec.*, No. 1:22-CV-01765-DAC, 2023 WL 4685368, at *11 (N.D. Ohio July 21, 2023). Multiple courts in this judicial district have "upheld Step Five determinations despite an actual conflict between the RFC and DOT where the ALJ inquired about conflicts, conflicts were not brought to the ALJ's attention, and the VE testified that no conflict exists." *Cross v. Comm'r of Soc. Sec.*, 1:16-cv-2003, 2017 WL 2684426, at *5 (N.D. Ohio June 2, 2017) (collecting cases), *report and recommendation adopted*, 2017 WL 2671089 (N.D. Ohio June 21, 2017). This holds true even when the claimant, post-hearing, points out conflicts between the VE testimony and the DOT. *Id.* at *5-6. I therefore conclude the ALJ did not err at Step Five and decline to order a remand on this basis.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disabled widow's benefits and supplemental security income.

Dated: November 6, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE